KOG
1/25/18



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Philip A. Selden*
*Assistant United States Attorney*
*Philip.Selden@usdoj.gov*

*Office Location:*          DIRECT: 410-209-4900
*36 S. Charles Street, 4th Floor*      MAIN: 410-209-4800
*Baltimore, MD 21201*

January 25, 2018

Jason Downs, Esq.
Downs Collins, P.A.
729 East Pratt Street, Suite 560
Baltimore, MD 21202

Re:    United States v. Daryl Christopher Wade
       Criminal No. [To Be Determined]  *CCB - 18-058*

Dear Mr. Downs,

    This letter, together with the Sealed Supplement, confirms the plea agreement that has been offered to your client Daryl Christopher Wade (the "Defendant") by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on January 26, 2018**, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

    1.    The Defendant agrees to waive indictment and plead guilty to a criminal Information, which will charge him with Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951. The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

<u>Elements of the Offenses</u>

    2.    The elements of the offenses, to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the Defendant obtained property from another with that person's consent; (2) under color of official right; and (3) in such a way as to interfere with or affect interstate commerce.

<u>Penalties</u>

    3.    The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a maximum sentence of twenty years of imprisonment, followed by a term of supervised release of three years, and a fine of $250,000 or a fine of not more than

equal to twice the gross gain or loss caused by the offense, whichever is greater. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. If a fine is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

### Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

     5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

     6.      This Office and the Defendant understand, agree, and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and the following applicable sentencing guidelines factors for Count One, Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951:

      a.      Base Offense Level. This Office's position is that pursuant to U.S.S.G. § 2C1.1(a)(1), the offense level for Count One, Extortion Under Color of Official Right, is **fourteen (14)** because the Defendant was a public official. The Defendant's position is that pursuant to U.S.S.G. § 2C1.1(a)(2) the base offense level for Count One, Extortion Under Color of Official Right, is **twelve (12)**;

      b.      This Office's position is that the offense level is increased by **fourteen-levels (14)**, pursuant U.S.S.G. §§ 1B1.3 (relevant conduct) and 2C1.1(b)(2) and 2B1.1(b)(1)(H), because the value of the payment, the benefit received or to be received in return for the payment, the value of

anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, was more than $550,000 but was not more than $1,500,000[1]. The Defendant contests the application of U.S.S.G. § 2B1.1(b)(1)(H) and instead contends that the offense level should be increased by **two-levels (2)**, pursuant U.S.S.G. § 2B1.1(b)(1)(B) because the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, was more than $6,500 but was not more than $15,000;

      c.     This Office's position is that the offense level is increased by **four-levels (4)**, pursuant to U.S.S.G. § 2C1.1(b)(3), because the offense involved a public official in a high-level decision-making or sensitive position. The Defendant contests the application of U.S.S.G. § 2C1.1(b)(3) (public official in a high-level decision-making or sensitive position).

      d.     Acceptance of Responsibility. This Office does not oppose a **two-level (2)** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. In the event that the base offense level is 16 or greater, this Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one-level (1)** decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. Accordingly, the final adjusted offense level is expected to be either **twenty-nine (29)** (this Office's position) or **twelve (12)** (the Defendant's position).

      7.     The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

      8.     This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range (with the exception of the matters set forth in paragraph 6), no other

---

[1]     Per Attachment A, the stipulated Statement of Facts, this offense level is calculated by combining the following: 1. $700, which is the value of the bribe payments by **STEPHENS** to **WADE**; 2. $1,300,000 minus $260,000 = $1,040,000, which is the benefit to be received by Person A in return for the attempted bribe payment of $52,000; 3. $10,000 minus $2,200 = $7,800, which is the benefit received by Person B for the bribe payment of $2,200; and 4. $17,500 minus $5,000 = $12,500, which is the benefit received by Person C for the bribe payment of $5,000, with a corresponding total of $1,053,400, pursuant to U.S.S.G. §§ 2C1.1(a)(2) and 2B1.1(b)(1)(H).

offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

Obligations of the Parties

9.      The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range, but must notify the Court, the United States Probation Officer and this Office, in writing, at least thirty (30) days in advance of the sentencing of the facts or issues the party intends to raise in connection with any such argument. The parties agree that a failure to provide such notice constitutes a waiver of the right to argue for a sentence outside of the final advisory guideline range.

10.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

Forfeiture

11.     The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

12.     The Defendant and the Government agree that it will be necessary for the Court to make a factual determination regarding the amount of the money judgment and the forfeiture of certain assets. To the extent that it is not possible for the Court to make that determination prior to the date of sentencing, the Defendant agrees to waive any right he may have to have the forfeiture determined at that time, and agrees that the Court may make any necessary factual determination in a post-sentencing proceeding, and may amend the order of forfeiture and the judgment to include the forfeited property at that time.

13.     The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

Assisting the Government with Regard to the Forfeiture

14.     The Defendant agrees to assist fully in the forfeiture of the foregoing assets. The Defendant agrees to disclose all of his assets and sources of income to the United States. The Defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

5

## Waiver of Further Review of Forfeiture

15.     The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## Restitution

16.     The Defendant agrees to the entry of a Restitution Order. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

17.     This Office will recommend to the Attorney General that any net proceeds derived from the sale of the Forfeited Assets be remitted or restored to eligible victims of the offense, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that this Office has authority only to recommend such relief and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

## Collection of Financial Obligations

18.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

19.     In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

20.     The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and

understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

21.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

      a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

      b.     The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, and term or condition of supervised release), *except* as follows: (i) the Defendant reserves the right to appeal any term of imprisonment above 30 months; (ii) this Office reserves the right to appeal any term of imprisonment to the extent that it is below 10 months.

      c.     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

      d.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

22.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

23.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Pre-Sentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the pre-sentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

(Cont'd)

8

## Entire Agreement

24.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

By:

Philip A. Selden
Leo J. Wise
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

**1-30-18**

Date

Daryl Christopher Wade

I am the attorney for Daryl Christopher Wade. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

1/30/2018

Date

Jason Downs, Esq.

9

## ATTACHMENT A – STATEMENT OF FACTS

*The parties hereby stipulate and agree that if this case proceeded to trial, the United States would prove the following facts below beyond a reasonable doubt. They agree that these are not all of the facts that would be proven if this case proceeded to trial.*

### Introduction

From 1988 until 2017, **DARYL CHRISTOPHER WADE** (hereinafter "**WADE**"), was employed by the City of Baltimore, Maryland. **WADE**'s last position was as a Construction Project Supervisor II in the Baltimore City Department of Transportation (hereinafter "DOT"). As a Construction Project Supervisor II, **WADE** supervised nineteen other DOT employees within DOT's Street Cut Unit, including fourteen DOT Public Works Inspectors and five administrative staff. **WADE**'s responsibilities at DOT's Street Cuts Unit also included monitoring the status of street cut fines, adjudicating fines, and participating in public appeal hearings pertaining to street cut fines.

The DOT Street Cuts Unit helped to monitor and administer fines associated with street cuts and street cut permits. Street cuts are defined as any excavation on or in the public way by or on behalf of any public or private utility or any other persons. The public way is defined as the entire area within the boundary lines of a public street, alley, sidewalk, or other right-of-way. Street cut permits are required by the Baltimore City Charter. No person may excavate on or in a public way unless the person obtains a street cut permit or the work is an emergency excavation. Street cut permits are valid for 120 days before they expire and a fine is assessed by DOT at $50 per day for each street cut not repaired past the expiration date.

**JEROME WALTER STEPHENS** (hereinafter "**STEPHENS**") was the owner of a construction and utilities company, A&A Construction & Utilities Inc., (hereinafter "A&A Construction") that regularly conducted business within the City of Baltimore, Maryland.

Starting in or about 2012, and continuing until sometime in or about 2015, **STEPHENS** paid **WADE** approximately five bribes, totaling approximately $700, in order for **STEPHENS** to avoid being fined for delinquent street cuts throughout the City of Baltimore. The agreement between **STEPHENS** and **WADE** was that **WADE** would monitor **STEPHENS'** street cuts that were past their expiration date and would alert **STEPHENS** to complete his street cuts in advance of fines being entered into the DOT fine system. In return, **STEPHENS** would "look out" for **WADE** by providing him cash and gift cards, ranging from $50 to $500.

### Attempted Extortion of Person A

Person A was the Vice President of a Virginia based company that provided all phases of underground utility construction and sewer rehabilitation throughout the east coast of the United States. Person A's company had approximately $55 million in contracts with the City of Baltimore to restore and/or replace water and sewer lines throughout the City. In order to complete those contracts, Person A's company conducted street cuts to reach water and sewer lines to restore

10

and/or replace these water and sewer lines in accordance with the City of Baltimore's consent decree agreement with the Environmental Protection Agency (Civil Action No. JFM-02-1524). The purpose of the consent decree was to take all measures possible to enable Baltimore to comply with the Clean Water Act including addressing the City's sewer lines discharging untreated sewage into to the Back River, Patapsco River, and the Chesapeake Bay.

From 2015 through 2016, Person A's company was also awarded approximately $36 million in contracts with the City of Baltimore to conduct additional sewer and water line overhauls. These contracts were awarded at City of Baltimore Board of Estimates meetings, which are open to the public.

On January 12, 2016, Person A received a text message from **STEPHENS**. The text message from **STEPHENS** to Person A stated, "[g]ood morning [Person A] this is **JEROME STEPHENS** from A&A Construction. I have something to tell you that you may be interested in. saving a lot of money for you. call me." Person A knew **STEPHENS** prior to this text message based on work that **STEPHENS**'s company had performed within the City of Baltimore. Person A's company had not previously employed **STEPHENS**.

On January 14, 2016, Person A met with **STEPHENS** at one of Person A's offices, located in Prince George's County, Maryland. Person A attempted to speak with **STEPHENS** in the presence of a member of Person A's staff to discuss the January 12, 2016 text message, but **STEPHENS** instead asked that they go on a car ride. During that car ride, **STEPHENS** told Person A that Person A's company would be receiving $1.3 million in street cut fines from the street cuts unit in the near future. This was the first that Person A had learned of the $1.3 million in perspective fines. **STEPHENS** then said he had a connection in the street cuts unit that could reduce the $1.3 million in fines by 80% to $260,000, if Person A paid 20%, a $52,000 bribe, to **STEPHENS**'s connection. **STEPHENS** next proposed to Person A the possible payment options, including cash or money orders. Person A rejected both of these proposals.

Also during the car ride, **STEPHENS** made a telephone call to **WADE**. This call was witnessed by Person A, but **STEPHENS** never told Person A that it was **WADE** on the call, instead Person A believed that **STEPHENS** was talking to his connection in the street cuts unit. As **STEPHENS** was on the phone with **WADE**, **STEPHENS** stated to Person A that the $52,000 was for more than just one person. Person A believed that **STEPHENS** was repeating from the person on the other end of the call (**STEPHENS**'s connection), the fact that more than one person was involved. **STEPHENS** also stated something to the effect of: if you want to play you got to pay. **STEPHENS** further claimed that he did not want any money as part of the reduction of the fines, but wanted subcontracting work from Person A's company. Finally, **STEPHENS** explained that he would attempt to work out the details with his connection and get back to Person A. Person A made clear that he was not interested in paying the $52,000 bribe.

On January 28, 2016, **STEPHENS** called Person A and, during that call, **STEPHENS** offered to Person A that **STEPHENS** had a consultant, with a corresponding consulting company, and that **STEPHENS** was willing to run the $52,000 through the consulting company in order to distance Person A's company from the $52,000 bribe payment. Person A reiterated to

STEPHENS that he was not interested in paying the $52,000 bribe and would sue the City of Baltimore over the fines if necessary.

On March 30, 2016, Person A, at the direction of the FBI, sent a text message to STEPHENS, stating he wanted to touch base with STEPHENS regarding some work. STEPHENS replied that he just got back in town from vacation and suggested they get together the following week.

STEPHENS and Person A did not get together the following week, but on May 4, 2016, Person A consensually recorded a telephone conversation with STEPHENS. During the conversation Person A, again at the direction of the FBI, told STEPHENS that he (Person A) was still having problems with street cuts, but that he (Person A) did not receive the $1.3 million in fines. Person A further indicated that he was still receiving other street cut fines. Person A then asked if STEPHENS could help him out with what they previously discussed, referring to the $1.3 million in street cut fines. During the call the following exchange took place between Person A and STEPHENS:

| | |
|---|---|
| STEPHENS: | I'll do some, some ground checking before you and I meet up so I can see if there's any, anything that we can still do, 'cause I don't know if that deal went away or not, whatever they were talking about before. I don't – |
| Person A: | Yeah. |
| STEPHENS: | I don't know, you know, if they got cold feet or what, so I'll give a call back and see if there's anything that can still be done. |
| Person A: | Okay, aright. |
| STEPHENS: | and ah, I'll let you know. |
| Person A: | Alright. |

Between late April 2016 and early May 2016, STEPHENS and WADE had four separate conversations regarding their solicitation of the bribe from Person A. WADE explained to STEPHENS that the bribe amount in question was too large and for that reason, WADE was not comfortable with this attempted bribe.

### Extortion of Person B

In February 2016, Person B, a local Baltimore business owner, began renovations on a restaurant located on Falls Road in Baltimore, Maryland. The restaurant's physical plant required a complete overhaul. Included in this overhaul was increasing the size of the restaurant's water lines and their attachment to the City's exterior water supply, both of which were located beneath Falls Road. The increased water supply would allow the restaurant's fire sprinklers to function

effectively. Person B's renovations to the restaurant included purchases of items from out of the state of Maryland. Person B hired **STEPHENS** to overhaul the water lines and the attachment.

In or about July 2016, as a result of the need to overhaul the water lines and the attachment, **STEPHENS** informed Person B that he (**STEPHENS**) would have to cut into Falls Road. Person B applied for a permit to perform the necessary street cut, however the permit was delayed, and in the interim, the City paved new asphalt on the entire street, from curb to curb, within the boundary lines of Falls Road.

As a result of the City's application of new asphalt from curb to curb, and only after **STEPHENS** performed street cuts into Falls Road, did **STEPHENS** inform Person B that Person B would have to completely repave Falls Road once **STEPHENS** was done. **STEPHENS** informed Person B that the complete repaving, from curb to curb, had an estimated additional cost to Person B of between approximately $10,000 to approximately $12,000. **STEPHENS** knew that Person B was on a limited budget and had not budgeted to completely repave Falls Road. **STEPHENS** then told Person B that he (**STEPHENS**) had a connection "downtown" in the City of Baltimore who could save Person B on the costs associated with completely repaving Falls Road if Person B was willing to pay a bribe. Specifically, **STEPHENS** told Person B that if Person B paid **STEPHENS'** City connection a bribe, by way of **STEPHENS**, Person B would not have to completely repave Falls Road from curb to curb, but instead could complete two smaller patches specifically over **STEPHENS'** street cuts, thereby avoiding the additional approximately $10,000 to $12,000 cost. Due to Person B's limited budget, and the fact that the street had already been cut, Person B agreed to pay the bribe to **STEPHENS'** connection in the City in order to repave the smaller areas with patches.

In early July 2016, **STEPHENS** and **WADE** discussed Person B paying **WADE** a bribe in exchange for allowing Person B to patch two smaller areas, approximately six-by-six feet, on Falls Road. **STEPHENS** and **WADE** discussed how much **WADE** would accept and **WADE** agreed to a $2,200 bribe for allowing Person B to repave the smaller sections of Falls Road.

On July 15, 2016, Person B gave **STEPHENS** $2,200 in cash for **STEPHENS** to pay as a bribe to **STEPHENS'** Baltimore City connection in exchange for allowing for the patching of the two smaller sections of Falls Road.

**STEPHENS** then gave **WADE** the $2,200 bribe. **STEPHENS** next contacted Person B and told Person B that **DARYL WADE** was the inspector who needed to look at the street cuts in Falls Road before it was repaved. Subsequently, **WADE** drove his Baltimore City vehicle to Falls Road in order to make it appear that he had inspected the street cuts and that two smaller patches were appropriate, when in fact **WADE** had already been paid the $2,200 bribe to allow Person B to not have to completely repave Falls Road from curb to curb. After **WADE** went to Falls Road, he sent a text message to **STEPHENS** where he described the smaller patches by stating, "[o]ne patch is great (other than not goin [sic] to the curb) and the other is shitty. Lines like a [sic] 7 yr old did them."

13

**Extortion of Person C**

In March 2016, Person C, a registered FBI cooperating human source in another investigation, and the owner of a plumbing and drain construction company in Baltimore, Maryland, received a street cut fine for approximately $17,500 for a street cut on Preston Street in Baltimore, Maryland (hereinafter "Preston Street"). Person C regularly performed plumbing and drain construction work in Baltimore and obtained supplies, including piping from North Carolina.

Upon receiving notice of the $17,500 street cut fine, Person C reviewed his company's various work site information and determined that he was not responsible for the Preston Street location. Person C then appealed this street cut fine to Baltimore City.

In March 2016 a Baltimore City street cut appeal hearing was held regarding the $17,500 Preston Street fine. At the hearing were Baltimore City employees including **WADE**. Before the hearing commenced **WADE** met with another Baltimore City employee and discussed the Preston Street fine. **WADE** determined that the Street Cut Unit would be unable to prove that Person C was responsible for the fine location, and thus this fine would be abated.

Despite **WADE**'s knowledge that this fine should be abated, the hearing went forward and during the hearing, Person C explained to the attendees, including **WADE**, that Person C was not responsible for the fine in question at Preston Street. Rather than tell Person C that he was not responsible for Preston Street fine, **WADE** stopped the hearing, stating that he had heard enough and that the fine determination was on hold pending further review. **WADE** then requested to speak with Person C outside the hearing. Once outside the hearing, **WADE** explained to Person C that if Person C helped him (**WADE**), that he (**WADE**) would help Person C.

On September 19, 2016, Person C participated in a consensually recorded telephone conversation with **WADE**. During this call Person C explained that he did not have money to pay the fine for Preston Street. **WADE** said he would look into the fine and get back to Person C. Shortly after this call, **WADE** called back Person C. **WADE** asked Person C for his current location and Person C replied with his location. **WADE** then stated that he was five minutes away, and was on his way to Person C's location.

As **WADE** arrived at Person C's location, Person C was holding his (Person C's) cell phone in his hand in an attempt to record the meeting with **WADE**. Person C's recording attempt was unsuccessful because upon **WADE**'s arrival he (**WADE**) told Person C to put his cell phone into his (Person C's) car. Person C followed **WADE**'s instruction and put his (Person C's) phone in his car, Person C then told **WADE** again that he did not have the approximately $17,500 to pay the fine. **WADE** asked Person C, "what is it worth to you?" Person C understood that this meant that if he (Person C) paid **WADE**, **WADE** would void the $17,500 fine. When Person C did not say anything in response, **WADE** then stated, "think about it." Person C then stated, "man I don't have the seventeen thousand." **WADE** then repeated, "think about it. What is it worth to you?" Person C then replied, "five." **WADE** then asked the question, "five hundred?" Person C stated, "no, five thousand." **WADE** then stated, "that will work." **WADE** told Person C that after making

14

the $5,000 payment, Person C did not have to worry about any future fines. **WADE** instructed Person C to call him prior to starting any jobs and that Person C would be covered.

Person C informed **WADE** that Person C would be receiving a check soon and he would contact **WADE** when he had the $5,000. Person C said that either on or about September 20, 2016, or on or about September 21, 2016, Person C would call **WADE** to set up a time to meet.

Subsequently on September 21, 2016, Person C participated in a consensually recorded telephone conversation with **WADE**. Person C told **WADE** he "got that" referring to the $5,000. **WADE** and Person C then agreed to meet the following day.

On September 22, 2016, the FBI provided Person C with $3,000 in cash to pay to **WADE** at a meeting between **WADE** and Person C. **WADE** arrived at the meeting with Person C near Gay Street in Baltimore City driving a Baltimore City government vehicle and he (**WADE**) instructed Person C to throw the payment into the Baltimore City government vehicle. Person C then threw the $3,000, which was in an envelope, into **WADE**'s Baltimore City government vehicle. During the meeting the following exchange took place:

| | |
|---|---|
| **WADE:** | Yeah. I ain't gonna hold you up man but you straight though. Umm. |
| Person C: | Yeah. (Unintelligible). |
| **WADE:** | All your stuff went in. |
| Person C: | You wanna go in one of the houses or you wanna? |
| **WADE:** | Yeah, I was gonna. Walk me to the car and just throw it in the car. |
| Person C: | All right. |
| **WADE:** | Yeah. Umm. Your stuff is in. If you get any more invoices, just call me, and I'll make sure it goes away. |
| Person C: | All right. |
| **WADE:** | 'Cause it. I mean it shouldn't come back but if you get another one, right? So the one you have is null and void, 'cause it's been cleared out. |
| Person C: | All right. I got, I got three right now. I'll have the other two next week. You straight with that? |
| **WADE:** | That's fine. That's – |
| Person C: | All right. |

**WADE:**     That's fine.  Tell me that next time.

Person C:     I, I couldn't get it all out at once.

**WADE:**     Oh, okay.

Person C:     My bad.  I couldn't get it all in one shot man.

**WADE:**     All right.  All right.

Person C and **WADE** then walked over to **WADE**'s Baltimore City government vehicle and continued the following conversation:

**WADE:**     We straight though, right?  I ain't gotta worry about you though?  You don't need the other shit right?

Person C:     Fuck no.  Just uh.

**WADE:**     Huh?

Person C:     Make sure ah that don't bite me in the ass.

**WADE:**     Nah, I got you.  And like, like I, like I told you uh, you good for life with me.

Person C:     Cause that.

**WADE:**     Just, just uh, don't leave me hanging.

Person C:     Yeah.

**WADE:**     You know what I'm saying?  When I say don't leave me hanging?  If you got something outstanding, I'll call you, and I'll jump on it right away, you know what I'm saying?

Person C:     Yeah.

**WADE:**     Just don't leave me hanging.  And stay the fuck away from the city mother fuckers cause that's gonna get everybody busted.

Person C:     Alright.

**WADE:**     They watching them like hawks.

Person C:     As long as you can, cause that's a lot. You know what I'm.

16

| | |
|---|---|
| **WADE:** | It's done. |
| Person C: | The seventeen? |
| **WADE:** | It's done.  It's done. |
| Person C: | That's fucking crazy. |
| **WADE:** | It's done.  It's done.  You got my word on that.  It's done. |
| Person C: | Alright. |
| **WADE:** | Luckily I, I control how that works so. |
| Person C: | Alright. |
| **WADE:** | You good. |

Later in the same conversation, Person C explained to **WADE** that he (Person C) did not want to have a fine related to a street cut that Person C was not associated with on Barclay Street in Baltimore, Maryland.  Specifically, the following exchange occurred between Person C and **WADE**:

| | |
|---|---|
| Person C: | Don't, that shit up there on Barclay though ain't me bro. |
| **WADE:** | Nah I got you.  I already dealt with it. |
| Person C: | Yeah I don't want that shit. |
| **WADE:** | I got you. I got you.  You said you ain't go outside, I believe you, you ain't got no reason to lie to me, shit, we in cahoots now [laughs]. |
| Person C: | [laughs]. |
| **WADE:** | We in cahoots now, but nah you straight bro.  You ain't – don't sweat that shit. |

On September 27, 2016, Person C participated in consensually recorded telephone calls with **WADE**.  Person C and **WADE** agreed to meet on September 28, 2016, in the neighborhood of Baltimore, Maryland known as Canton.

On September 28, 2016, the FBI provided Person C with $2,000 to pay to **WADE** at the meeting between **WADE** and Person C in the Canton neighborhood of Baltimore.  Before Person C made the $2,000 payment to **WADE**, **WADE** and Person C discussed an outstanding street cut

fine that had been leveled on Person C during the summer of 2015 and whether **WADE** could get it removed.  The following exchange took place between **WADE** and Person C regarding 2015 street cut fine:

| | |
|---|---|
| Person C: | It wasn't this – it wasn't this summer. |
| **WADE:** | Last summer. |
| Person C: | It was last year. |
| **WADE:** | Send me the um – |
| Person C: | But it says – |
| **WADE:** | Just take a picture of it with your phone and send me the picture. |
| Person C: | 'Cause it says um – the court thing vs. [Person C's company name].  So I don't know how that? |
| **WADE:** | Yeah we got – |
| Person C: | I don't know if that's too far. |
| **WADE:** | The lawyers are now taking over all our outstanding cases.  The city, the city lawyers are taking over all our outstanding cases.  But uh, send it to me. I'll see what I can do. |
| Person C: | Alright.  I mean it's only a thousand.  If I gotta pay it, I gotta pay it. |
| **WADE:** | Nah, send it to me I'll see what I can do. |
| Person C: | Alright. |
| **WADE:** | I'll see what I can do.  I'll do the best I can. |
| Person C: | Straight. |
| **WADE:** | If I can make it go away I will.  If I can make it go down, I will.  Whatever. In that order.  I'm try to make it go away though. |
| Person C: | Alright. |

At one point later in the conversation, **WADE** instructed Person C to walk over to Person C's truck and open the truck's door to make it appear that **WADE** and Person C were looking inside the truck.  After walking over and opening the door to Person C's truck, **WADE** and Person

18

C then made small talk discussing Person C's desire to sell his truck as video recording equipment captured Person C's hands counting $100 bills. Specifically, the following exchange took place:

> **WADE:** Open the door, open the door, like, you looking at your paperwork or something.

Person C and **WADE** then walked to Person C's truck. Person C next counted $100 bills and as he is counted the $100 bills Person C had a non-pertinent conversation with **WADE** regarding the sale of Person C's truck. After the discussion concerning the sale Person C's truck, the following exchange occurred about the 2015 fine and **WADE** then instructed Person C how he should give **WADE** the $2,000 bribe:

> **WADE:** If you got – don't forget to take a picture of umm – the letter [2015 fine letter].
>
> **Person C:** I'm gonna send that – yeah send that to you.
>
> **WADE:** If you got it at home.
>
> **Person C:** Yeah.
>
> **WADE:** Yeah don't forget, send it to me tonight, so I have it tomorrow.
>
> **Person C:** Alright.
>
> **WADE:** I can look into it. Just put it on the seat. Yeah, that way ain't nobody looking at me, you handing me nothing.
>
> **Person C:** I hear you. Um, what it – do I get like a letter, or would they send me something saying it's satisfied? Or they just, it just goes away?
>
> **WADE:** Um, what you talking about? The 17?
>
> **Person C:** Yeah.
>
> **WADE:** The 17 gone away.
>
> **Person C:** It just goes away.
>
> **WADE:** You ain't gonna see nothing.
>
> **Person C:** I ain't gonna see nothing.
>
> **WADE:** Nope. That's gone away.

| Person C: | Alright. |
|---|---|
| **WADE:** | Umm now this one that you're dealing with, you'll get something from that saying, "We're sorry your fine was waived" or whatever. |
| Person C: | Alright. |
| **WADE:** | For this one, the 17 (unintelligible). |
| Person C: | I'll send you that other one. |
| **WADE:** | Yea. |

Following this meeting between **WADE** and Person C, Person C sent **WADE** a text message including a photo of the $1,000 fine paperwork. **WADE** responded back to this text message that this fine was "already in court" and that there was "nothing I can do." Finally, after **WADE** had received the bribe payments from Person C he (**WADE**) sent an email to stop the invoices for Person C for the Preston Street $17,500 fine.

\* \* \*

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

**1-30-18**
_____
Date

Daryl Christopher Wade

I am the attorney for Daryl Christopher Wade. I have carefully reviewed the statement of facts with him.

1/30/2018
_____
Date

Jason Downs, Esq.

20